IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES BISTOK,<br><br>    *Plaintiff,*<br><br>v.<br><br>PENN MANUFACTURING INDUSTRIES, INC.,<br><br>    *Defendant.* | CIVIL ACTION<br>NO. 17-02097 |

**PAPPERT, J.**                                                                                                  January 31, 2018

## MEMORANDUM

      James Bistok was 75 years old when he was hired as a calibration technician by Penn Manufacturing Inc., a machine parts manufacturing firm. Bistok worked at Penn Manufacturing for over four years before being fired at the age of 79 and replaced by a substantially younger worker. Bistok felt he was fired because of his age and sued Penn Manufacturing under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et. seq.* ("ADEA"), the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et. seq.* ("PHRA"), and the Pennsylvania Wage Payment Collection Law, 43 P.S. §§ 260.1, *et. seq.* ("WPCL"). Penn Manufacturing, which contends that it was Bistok's poor job performance that did him in, moved for summary judgment on all claims.[1] The Court, after reviewing the record and holding oral argument, denies the Motion for the reasons that follow.

---

[1]     Bistok withdrew his WPCL claim in his response to Penn Manufacturing's motion (ECF No. 17-1, at 1) something Bistok's counsel confirmed at oral argument (Hr'g Tr. at 34:12–14).

# I

For over twenty years, Bistok owned a business which sold and calibrated measuring devices. (Def's Mot. & Mem. for Summary Judgment, Ex. B ("Bistok Dep.") at 7:8–8:24, ECF No. 16.) After closing his business, Bistok applied for a part-time calibration technician position at Penn Manufacturing. (Pl's Resp. in Opp., Ex. A ("Hartz Dep.") at 6:13–22, ECF No. 17-2.) The calibration technician job is comprised of both technical and administrative duties. (Resp., Ex. G, ("Probation Form"), ECF No. 17-2; Mem., Ex. D ("MacIntosh Dep.") at 36:16–18.) The technical duties include inspecting and calibrating gauges, distributing and collecting gauges from shop employees, and testing equipment for recalibration. (Mem., Ex. C ("Calibration Technician Job Description").) The administrative duties, which comprise anywhere from 50 to 90% of the job's responsibilities, include maintaining databases, records and reports for gauge calibration. (*See* Mem., Ex E ("Knechel Dep.") at 10:16–21; Def.'s Answer to Compl. at ¶ 11, ECF No. 3; MacIntosh Dep. at 16:12–20; Ex. C; MacIntosh Dep. at 16:15–16.)

Penn Manufacturing hired Bistok in 2011 and he immediately began a required 90 day probationary period. (Resp., Ex. G; Hartz Dep. at 11:13–23, 15:10–13.) Jody MacIntosh, Penn Manufacturing's Quality Manager, described the probationary period as a time to evaluate employees to determine if they are capable of performing "all of the appropriate and required tasks for the position[.]" (MacIntosh Dep. at 12:14–19, 22:7–9; Hg'r Tr. at 12:14–16.) Penn Manufacturing's probation policy states that if an employee is "satisfactorily meeting all company requirements [the employee] will be considered a regular employee." (Resp., Ex. G.) If a part-time employee cannot

satisfactorily perform the job, he will not become a regular employee. (Hartz Dep. at 12:24–13:2; MacIntosh Dep. at 13:4–9.) MacIntosh, who was Bistok's direct supervisor from 2012 until 2015, testified that he could not recall any instance when an employee performed poorly during the probationary period but still became a regular employee. (MacIntosh Dep. at 13:24–14:3.)

Bistok successfully completed the probationary period and became a regular employee in May or June of 2011. (Hartz Dep. at 23:22–25:1.) Based on his prior experience and mechanical ability, Bistok successfully completed his technical duties, though Penn Manufacturing contends he was "horrible" at his administrative duties, forcing Christine Knechel, who frequently enters data for the quality control department, to perform that part of Bistok's job from the time he started in 2011. (MachIntosh Dep. at 15:20–16:7; Resp., Ex. H, ("Defendant's Answer to Interrogatories") at 3; Knechel Dep. at 6:17–8:7.) Bistok, however, testified that while he occasionally required assistance completing his administrative duties, these were "isolated instances" and the result of never having been fully trained. (Bistok Dep. at 14:24, 15:9–18:5.)

In March 2015, Penn Manufacturing hired David Freeburger with the intention of replacing Bistok. (MacIntosh Dep. at 37:25–38:3.) Bistok was required to train Freeburger as a calibration technician, and after Bistok demanded a raise to compensate him for this additional responsibility, he received an additional three dollars and fifty-eight cents per hour. (*See id.* at 22:10–12; Bistok Dep. at 35:19–21.) Penn Manufacturing contends that Bistok only trained Freeburger on the technical

aspects of the position. (MacIntosh Dep. at 36:21–37:3; Knechel Dep. at 18:16–19.)[2]
Bistok, however, did not indicate that there were any limitations on his training
responsibilities. (Bistok Dep. at 27:16–22; Hg'r Tr. at 47:21–23.)

After Freeburger was trained, MacIntosh recommended to Penn Manufacturing's
owners that Bistok be fired.[3] (MacIntosh Dep. at 33:24, 34:5–7; Resp., Ex. E
("Statement of Michael Hartz").) Bistok was laid off in August 2015 as part of a
reduction in force, in part based on his poor performance. (Hartz Dep. at 33:11–24,
35:5–7; Hg'r Tr. at 28:11–19.) Freeburger later resigned, and Penn Manufacturing
hired a replacement from outside the company, Jerome Gass. (Hg'r Tr. at 10:19.) Gass
was transferred soon thereafter, and "Bistok was called back for an interview" in
September.[4] (Resp., Ex. E; Resp., Ex. H ¶ 11.) MacIntosh advised Bistok "that an
additional employee was going to be hired [but] ultimately decided that another
candidate was better suited for the position and…Bistok was not rehired." (Resp., Ex.

---

[2] MacIntosh provided somewhat conflicting testimony on this issue. When asked if Bistok's training of Freeburger was limited to the technical duties, he responded "no." (MacIntosh Dep. at 36:21–23.) He also testified that, to his memory, Freeburger's training was split between Bistok and Knechel. (*Id.* at 37:1–3.)

[3] Bistok alleges that Al Reichenbach, his supervisor from 2011 until MacIntosh was hired in 2012, consistently called him an "old man" and was part of the decision to fire him. (Pl.'s Statement of Material Facts ¶ 29, ECF No. 17-1.) The comments allegedly made by Reichenbach could constitute "stray remarks," which when made by "non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). MacIntosh testified that Reichenbach was not involved in the decision to terminate Bistok. (MacIntosh Dep. at 33:24–34:7; Hg'r Tr. at 18:18–19:15.) Bistok claims that when he met for the interview in September 2015, MacIntosh claimed to have consulted Reichenbach on the termination decision. (Hg'r Tr. at 55:3–5.) Resolution of this issue is for the jury.

[4] Penn Manufacturing contends that this was not an interview, but merely a courtesy meeting to explain to Bistok that he was laid off for poor performance. (*See* Def.'s Reply at 1–2, ECF No. 18; Bistok Dep. at 41:1–10.) In their answer to interrogatories, however, Penn Manufacturing states that Bistok contacted MacIntosh "and came in for an interview…but a different candidate was selected based on the other candidate's qualifications." (Resp., Ex. H ¶ 11.) Hartz's statement also indicates that Bistok was interviewed for the position. (Resp., Ex. E.)

4

H ¶ 11.) Valu Vyas was selected for the job and remains in that position today. (Hg'r Tr. at 11:16–18.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Mutli-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party. *Id.* at 252. Summary judgment is appropriate where "the moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowell v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weight the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

Bistok's claims of age discrimination under the ADEA and PHRA[5] are evaluated under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Bistok must therefore first establish a *prima facie* case of discrimination. If he does so, Penn Manufacturing must articulate a legitimate nondiscriminatory reason for his termination. If the company can provide such a reason, the burden shifts back to Bistok to establish by a preponderance of the evidence that Penn Manufacturing's stated reason is pretextual. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

A

To establish a *prima facie* claim of age discrimination in a reduction in force case, Bistok must show: (1) that he is forty years of age or older; (2) Penn Manufacturing took an adverse employment action against him; (3) he was qualified for the position; and (4) the employer retained a sufficiently younger employee who was similarly situated. *See Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 249 (3d Cir. 2002); *see also Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009). The requirement to make out a *prima facie* case is not intended to be onerous. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (quoting *Furnco Const. Co. v. Waters*, 438 U.S. 567, 577 (1978) (quotations omitted)). Penn Manufacturing does not dispute that Bistok has satisfied the first, second and fourth elements. Bistok was 79 years old when he was laid off and Penn Manufacturing retained a sufficiently younger employee who was similarly situated. (*See* Hg'r Tr. at 2:22–3:3; 53:16.) Penn

---

[5] Claims of age discrimination under the ADEA and PHRA are analyzed similarly. *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

Manufacturing contends that Bistok was not qualified for the calibration technician position.

A "plaintiff's qualifications for purposes of proving a *prima facie* case [are determined] by an objective standard." *Sempier*, 45 F.3d at 729 (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). "'[W]hile objective qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to' consideration of whether the employer's nondiscriminatory reason for discharge is pretext." *Id.* (quoting *Weldon*, 896 F.2d at 798). In *Sempier*, the Third Circuit Court of Appeals relied on the plaintiff's "objective experience and education necessary to qualify as a viable candidate for the positions he held." *Id.*

Considering the evidence in the light most favorable to Bistok, he was qualified for the position from which he was discharged. Bistok had over twenty years experience in the gauge industry prior to joining Penn Manufacturing. (Bistok Dep. at 7:8–8:8.) He was hired as a part-time employee for a position comprised of 50 to 90% administrative responsibilities, and after he satisfactorily completed the probationary period, became a regular employee. (*See* MacIntosh Dep. at 16:12–20; Bistok Dep. at 7:8–9; Hartz Dep. at 23:22–25.) During his four years of employment, Bistok trained a new hire and received a raise. (*See* MacIntosh Dep. at 22:10–12; Bistok Dep. at 35:19–21; Hg'r Tr. at 26:18–24.) After being discharged, Bistok was interviewed for his old job. (Resp., Ex. E; Resp., Ex. H ¶ 11.) Bistok's experience, promotion to regular employee (which meant that his employer deemed him capable of performing "all of the appropriate and required tasks for the position" and that he was "satisfactorily meeting

all company requirements"), responsibility for training a new hire, receipt of a raise and being interviewed when his former job came open shows that Penn Manufacturing considered Bistok qualified for the position. (MacIntosh Dep. at 12:14–19, 22:7–9; Resp., Ex. G.)

Penn Manufacturing's burden of articulating a nondiscriminatory reason is "relatively light" and is satisfied "if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Tomasso v. Boeing co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted)). Penn Manufacturing employees testified that Bistok was discharged, along with others, during a reduction in force because of poor job performance. (*See* Hartz Dep. at 34:14–35:7; MacIntosh Dep. at 15:20–16:7.) This is sufficient to satisfy the company's burden.

To show pretext, Bistok must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427. "When a plaintiff challenges the credibility of the employer's proffered justifications, he must produce evidence demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 307 (3d Cir. 2015) (quoting *Burton*, 707 F.3d at 427 (internal quotations omitted)). The

8

plaintiff "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Id.* (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc)).

Bistok has produced sufficient evidence to allow a reasonable jury to find that Penn Manufacturing's proffered justification for firing him is unworthy of credence. *See Burton*, 707 F.3d at 430 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012)). Specifically, Penn Manufacturing's purported reasons for firing Bistok are contradictory and inconsistent. Penn Manufacturing argues that there was a reduction in force, and Bistok was selected based on poor performance. (*See* Hg'r Tr. at 28:11–19.) The company claims that Bistok's poor performance was apparent from the day he started, but this is inconsistent with MacIntosh's testimony. MacIntosh observed Bistok's work on a daily basis after becoming his supervisor in 2012, but failed to identify his poor performance for over two years. (*Compare* Resp., Ex. H at 3 *with* MacIntosh Dep. at 16:25–17:15.)

Penn Manufacturing's proffered reason is also contradicted by the fact that Bistok successfully completed the probationary period and became a regular employee, which would not have occurred if he were not performing "*all* of the appropriate and required tasks for the position[.]" (MacIntosh Dep. at 12:14–19 (emphasis added); *see also* Hartz Dep. at 24:23–25:1.) That Bistok satisfactorily performed his duties during the probationary period is further supported by MacIntosh's testimony, who could not recall a single instance when an employee performed poorly during probation but still became a regular employee. (MacIntosh Dep. at 13:24–14:3.) Moreover, Bistok asserts

9

that he performed well, and is not "the district court's role on summary judgment to compare the testimony…and decide who is credible." *Sempier*, 45 F.3d at 731 (citing *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 901 (3d Cir. 1987)). Bistok was never written up or disciplined during his four years of employment, despite the fact that the administrative duties he allegedly performed poorly comprised 50 to 90% of the job. (*See* Knechel Dep. at 10:16–21; Def.'s Answer to Compl. ¶ 11; MacIntosh Dep. at 16:12–20; Tr. Oral Argument at 26:2–24.) The jury could conclude that Penn Manufacturing's failure to discipline Bistok for allegedly performing most of his responsibilities poorly for over four years "makes suspect its *post hoc* assertions of poor performance." *Sempier*, 45 F.3d at 731.

Bistok was also required to train his replacement and received a wage increase in 2015. Read in the light most favorable to Bistok, a reasonable jury could conclude that he would not have received additional responsibilities or a raise if he were performing poorly. After being laid off, Bistok was interviewed *for the same position* less than a month later. (*See* Resp., Ex. E; Resp., Ex. H ¶ 11.) "While this evidence does not itself establish age discrimination, a jury might reasonably determine from these events" that Penn Manufacturing removed Bistok "because of his age and not because of poor performance." *Sempier*, 45 F.3d at 733. Both parties have "produced testimony and evidence that conflicts on the ultimate issue" of whether Bistok was discharged for poor performance or because of his age; this conflict "must be resolved by a jury and cannot be resolved on summary judgment." *Id.*

An appropriate order follows.

that he performed well, and is not "the district court's role on summary judgment to compare the testimony…and decide who is credible." *Sempier*, 45 F.3d at 731 (citing *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 901 (3d Cir. 1987)). Bistok was never written up or disciplined during his four years of employment, despite the fact that the administrative duties he allegedly performed poorly comprised 50 to 90% of the job. (*See* Knechel Dep. at 10:16–21; Def.'s Answer to Compl. ¶ 11; MacIntosh Dep. at 16:12–20; Tr. Oral Argument at 26:2–24.) The jury could conclude that Penn Manufacturing's failure to discipline Bistok for allegedly performing most of his responsibilities poorly for over four years "makes suspect its *post hoc* assertions of poor performance." *Sempier*, 45 F.3d at 731.

Bistok was also required to train his replacement and received a wage increase in 2015. Read in the light most favorable to Bistok, a reasonable jury could conclude that he would not have received additional responsibilities or a raise if he were performing poorly. After being laid off, Bistok was interviewed *for the same position* less than a month later. (*See* Resp., Ex. E; Resp., Ex. H ¶ 11.) "While this evidence does not itself establish age discrimination, a jury might reasonably determine from these events" that Penn Manufacturing removed Bistok "because of his age and not because of poor performance." *Sempier*, 45 F.3d at 733. Both parties have "produced testimony and evidence that conflicts on the ultimate issue" of whether Bistok was discharged for poor performance or because of his age; this conflict "must be resolved by a jury and cannot be resolved on summary judgment." *Id.*

An appropriate order follows.

BY THE COURT:

<u>/s/ *Gerald J. Pappert*</u>
GERALD J. PAPPERT, J.